EUGENIE ALVARES,

   Plaintiff,

  v.

BOARD OF EDUCATION OF THE CITY OF
CHICAGO,

   Defendant.

No. 18 CV 5201

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Eugenie Alvares taught the business program at George Westinghouse College Prep, a Chicago public high school, for five years. When the Board of Education decided to eliminate the program, it also terminated Alvares's employment. Alvares, who is Asian American and was 58 years old when laid off, accuses the Board of race and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. The Board moves for summary judgment under Federal Rule of Civil Procedure 56. The motion is granted.

## I. Legal Standards

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of Alvares, the nonmoving party. *Robertson v. Department of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020). But the moving party is entitled to summary judgment when the nonmoving

party fails to make "a sufficient showing on an essential element" of her case for which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrate its entitlement to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(3). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; N.D. Ill. Local R. 56.1(b)(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2).

Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3). If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." *Id.* Failure to properly controvert a fact results in its admission. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Facts that a party raises in a Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. I also disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006).

The parties did not abide by Local Rule 56 in their filings. In response to some of the Board's facts, Alvares cites several entire exhibits without explaining how specific parts of those exhibits controvert the Board's asserted facts. *See* [86] ¶¶ 52–53.[1] The Board, for its part, repeatedly states that Alvares's facts are disputed without providing any citation to the record. *See* [91] ¶¶ 9–11, 13, 15–17, 19–20. Under Local Rule 56.1(e)(3), those facts are not properly controverted and are therefore admitted (unless, as discussed below, they are excluded on other grounds).

In Alvares's additional statement of facts, moreover, she cites an entire 19-page exhibit to support "arguments for why she should have been rated higher" in her teacher evaluations. [91] ¶ 9; *see also id.* ¶ 18 (citing an entire 55-page exhibit). And some of Alvares's facts simply reference arguments, responses, and screenshots within exhibits, without detailing any facts supported by specific parts of those exhibits. *See id.* ¶¶ 9, 15, 17. These facts do not comply with the local or federal rules. *See* Fed. R. Civ. P. 56(c)(1)(A) (asserted facts must be supported by "particular parts of materials in the record"); *see also Compania Administradora de Recuperacion v. Titan Int'l, Inc.*, 533 F.3d 555, 562 (7th Cir. 2008) ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial."). Accordingly, I disregard Alvares's additional facts that do

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Alvares's response to the Board's Local Rule 56.1 statement, [86], and the Board's response to Alvares's statement of additional material facts, [91], where both the asserted fact and the opposing party's response are set forth in one document.

not identify specific evidence in the record or are based only on general references to entire exhibits. [91] ¶¶ 9, 15, 17, 18.

Alvares also flouts the local rule by relying on facts throughout her response brief that are not in her Rule 56.1 statement. *See* [85] at 2–5, 10–12, 14. "[P]roviding additional facts in one's responsive memorandum is insufficient to put those facts before the Court." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also Igasaki v. Ill. Dep't of Fin. & Prof'l Regs.*, No. 15-CV-03693, 2018 WL 4699791, at *2 (N.D. Ill. Sept. 30, 2018) ("Citing directly to new facts in the opposition brief is a clear violation of Local Rule 56.1."). Alvares also cites directly to the record throughout her brief, rather than to the 56.1 statements—another rule violation. *See Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 664–65 (N.D. Ill. 2015) (collecting cases). It is "essential to the court's proper consideration" of a party's arguments for the party to reference "the Local Rule 56.1 statements and responses and not the record materials themselves." *Id.* at 666. I disregard the facts that Alvares asserts for the first time in her brief.

On top of these Local Rule 56.1 issues, Alvares's statement of facts also suffers from several evidentiary defects. Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). I may consider "properly authenticated and admissible documents or exhibits" in a summary-judgment proceeding. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Under Federal Rule of Evidence 901(a),

to authenticate an item of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Jackson*, 940 F.3d 347, 351 (7th Cir. 2019) (quoting Fed. R. Evid. 901(a)).

Some of Alvares's additional facts come from exhibits that are inadmissible because they are unauthenticated, hearsay, or both. Alvares asserts that she sent a timeline to Tyler Ticknell (another teacher at Westinghouse) showing that she did not receive certain access codes needed to do her job. [91] ¶ 7. To support this fact, Alvares cites a document without a date, signature, or any indication that she sent the document to Ticknell. [85-8]. Alvares cites to no supporting affidavit or evidence in the record that could serve as authentication for this document. Even if Alvares could authenticate the timeline, moreover, it would still be inadmissible hearsay— she is introducing the timeline (an out-of-court statement) to prove that she did not receive certain codes. *See* Fed. R. Evid. 801. The same goes for the June 2017 letter that Alvares allegedly wrote to Carol Milazzo identifying "specific instances of discriminatory conduct on the part of [Alvares's supervisor, Westinghouse Principal Patrick] McGill." [91] ¶ 11. The letter is inadmissible hearsay; it is an out-of-court statement regarding McGill's discriminatory conduct, introduced to prove such conduct.

Next, Alvares cites a document purportedly containing her "responses to various concerns" regarding her job performance. [91] ¶ 15; [85-17] at 1–2. This nonspecific statement fails to assert a fact and, to the extent it is meant to dispute the truthfulness of the Board's claims about her work, the assertion is inadmissible

hearsay (out-of-court statements by Alvares, offered by Alvares, for the truth of Alvares's version of events). The email from Alvares's union representative accusing McGill of having personal animus and taking punitive action toward Alvares is also hearsay. [91] ¶ 16. And Alvares's statement that she could have been placed in a math-teacher role is unsupported by the document she cites—a collective bargaining agreement that took effect after Alvares was laid off. [91] ¶ 21.

I also disregard the screenshots of the teacher roster and uploaded courses. [91] ¶¶ 6, 8, 17. Alvares cites to no supporting affidavit or evidence in her deposition or elsewhere in the record that could serve as authentication for these screenshots. And, even setting these evidentiary flaws aside, the screenshots do not support the facts she asserts. Although Alvares does not appear on the roster she provides, there's no support for her assertion that the school deliberately left her off. The Google Drive screenshots of Mr. Johnson's course maps do not show that he uploaded them into the system late; the screenshot shows only when those documents were "last modified." [85-9] at 1.

That leaves the affidavits of teacher Sharron Anderson and business manager Conneka Travis. An affidavit can be used as evidence to oppose summary judgment, but it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). I may deem an affidavit inadmissible if it is "replete with generalized assertions" for which the affiant lacks personal knowledge. *See Smith v. Ill. Dep't of Transportation*, 936 F.3d 554, 559 (7th Cir. 2019).

Anderson's affidavit asserts, in relevant part, that she taught in the classroom next to Alvares's and they worked together under the same department chair; Alvares was a knowledgeable and resourceful teacher; and Anderson "felt that McGill treated [Alvares], myself, and other persons of color differently … [and] I was a victim of race discrimination, just as [Alvares] was." [91] ¶ 20; [85-22] ¶¶ 4, 6, 13. Travis's affidavit says that: (1) Alvares was a "caring … smart, enthusiastic, and dedicated" teacher who measured up to other Westinghouse teachers; (2) McGill heavily scrutinized Alvares's classroom-supply orders and treated her "different from white or Caucasian students and often referred to [Alvares] as stupid or dumb;" (3) McGill was caught whistling "Dixie"—a racially offensive song; (4) Travis believed that McGill had animus or bias against people of color because he terminated several African American custodians, and he did not approve an African American counselor's plans for college-bound students, but accepted a white counselor's plan for students; (5) other teachers and staff were also late on heavy snow days but not disciplined; and (6) McGill said he was "going to get [Alvares] up out of here." [91] ¶ 19; [85-21] ¶¶ 6–8, 13, 17–19.

The Board asks me to strike both affidavits in their entirety because "they contain only conclusory allegations, and subjective beliefs, and are unsupported by the record." [90] at 4. Alternatively, the Board requests that I strike statements that are "irrelevant, not based on personal knowledge, generalized, and unsupported by the record." *Id.*[2]

---

[2] The Board also says that Travis's affidavit cannot be authenticated because the certification page states "I, Sharron Anderson" instead of "I, Conneka Travis." [91] ¶ 19; [85-21] at 5.

Although both affidavits include some inadmissible material, I decline to strike them in their entirety. It is reasonable to infer that some of the information is relevant, based on personal knowledge, and admissible. For example, as Alvares's colleagues, it is reasonable to infer that Travis and Anderson had personal knowledge of Alvares's teaching performance. That is relevant to whether Alvares was meeting employer expectations and therefore admissible, even if this evidence is ultimately insufficient to create a factual dispute over whether Alvares met her employer's expectations. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).

Moreover, as the business manager at Westinghouse, Travis worked with both McGill and Alvares for years. It is reasonable to infer that she has personal knowledge of McGill and Alvares's relationship and interactions. Travis explains that she knew that Alvares's classroom-supply orders came under extreme scrutiny from McGill, because Travis would ultimately place those orders for the school. [85-21] ¶ 7. She also had knowledge that, during a three-year span working with McGill, he terminated two African American custodians, one African American business manager, referred to another African American employee as ignorant, and was caught whistling the Confederate song "Dixie" in front of African American employees. *Id.* ¶¶ 10, 13. Travis also claimed that, during her tenure, McGill never launched an investigation against a white teacher, but he did so against Alvares and an African American payroll clerk. *Id.* ¶ 20. All of this is based on Travis's personal

---

Despite this apparent drafting error, the rest of the document refers to only Travis, the signature line bears Travis's name, and the affidavit is signed by Travis. [85-21] at 5. There are enough indicia for me to conclude that the affidavit is a sworn statement by Travis.

knowledge and relevant; it is probative of whether McGill held bias against people of color in general.

Further, Travis's claim that McGill intended to "get [Alvares] up out of here," is not based on inadmissible hearsay. [85-21] ¶ 19. McGill's statements would be admissible at trial as the non-hearsay admission of a party opponent. *See* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is "offered against an opposing party and ... was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"). McGill's statements about Alvares—one of the teachers he supervised—were within the scope of his employment relationship with the Board, and he "was involved in the decisionmaking process affecting [Alvares's] employment action, which was enough to make [his] statement an admission under Rule 801(d)(2)(D)." *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 823 (7th Cir. 2011). And statements of then-existing intent or motive are not excluded by the hearsay rule. Fed. R. Evid. 803(3).[3]

On the other hand, some of the statements in the affidavits are inadmissible. Anderson's statement that Alvares was a victim of race discrimination is inadmissible because it is too generalized to show that Anderson had personal knowledge of any discrimination against Alvares. Anderson does not specify whether she witnessed McGill commit any acts of discrimination against Alvares, and without knowing

---

[3] Travis's claim that McGill was "conspiring" to "build a case" against Alvares is not admissible. *See* [85-21] ¶ 19. It is a lay opinion or conclusion that is not helpful to understand Travis's testimony (as a mere reporter of McGill's statements) and not relevant to determining a fact in issue. *See* Fed. R. Evid. 701. Whether Travis thinks a conspiracy was afoot is not something that would help a fact finder decide whether race motivated the decision to end Alvares's employment.

"what [he] did, and when [he] did it," there is "no way of knowing what to make of this evidence." *Smith*, 936 F.3d at 559. Travis's detailed description of unrelated incidents with McGill, her own firing, and the firing of other non-teacher employees, are inadmissible under Federal Rule of Evidence 402 because they are irrelevant to whether the Board's termination of Alvares was discriminatory. [85-21] ¶¶ 11–12, 14–15. Both affidavits contain several other irrelevant or inadmissible statements, but Alvares does not rely on them, so I need not address those issues further here.

## III. Facts

Eugenie Alvares, an Asian American over the age of forty, taught the business and accounting program at George Westinghouse College Prep (a Chicago Public School) from August 2012 until she was laid off in August 2017. [86] ¶¶ 1–3.[4] Alvares was a member of the Chicago Teachers Union, and its collective bargaining agreement with CPS governed the terms of her employment at Westinghouse. *Id.* ¶ 4. Principal Patrick McGill was Alvares's direct supervisor from Spring 2014 until her layoff. *Id.* ¶ 7; [91] ¶ 1.

### A. The Business Career and Technical Education Program

From 2008 until 2017, Westinghouse had four Career and Technical Education programs, which aimed to help students develop career-specific knowledge and skills in broadcast journalism, information technology, medicine, and business. [86] ¶ 5.

---

[4] The Board rehired Alvares in 2018 and she currently teaches at another CPS school. [86] ¶ 3.

Financial literacy was among the skills that CPS hoped to instill in its students. [91] ¶ 12. Alvares was the only teacher in Westinghouse's business program. [86] ¶ 6.

While the three other CTE programs excelled, the business program "floundered," and became less popular with students. *Id*. ¶¶ 11–12. Many students requested to transfer from the business program to other CTE programs, to the point where the three other programs were full and had no openings left. *Id*. ¶ 12. Enrollment in the business program declined, from roughly 90 students during the 2013–2014 school year, to 39 students in 2017. *Id*. At the same time, demand for engineering courses at Westinghouse grew; student enrollment quadrupled from 30 students to 120 students, and the school built a successful corporate partnership to support engineering courses, summer internships, and field experience. *Id*. ¶¶ 13–14. Based on these trends and the totality of the circumstances, McGill concluded that replacing the business program with a pre-engineering academy was in the best interest of students. *Id*. ¶ 15.

To close the business program, McGill followed the method set forth in the collective bargaining agreement: he received approval from the relevant CPS official and consulted with the Local School Council. *Id*. ¶ 16–17. In June 2017, CPS notified Alvares's union of the recommendation to close the program, and although the union had the opportunity to object, it did not do so. *Id*. ¶ 16. When the business program closed in August 2017, Alvares's position was eliminated and she was laid off. *Id*. ¶ 18. Alvares did not apply for another teaching position at Westinghouse. *Id*. ¶ 19. Alvares was certified to teach math, but there was no math-teacher vacancy for her

to fill. *Id*. Alvares's poor performance rating (discussed more below) also made her ineligible to "bump" a math teacher from his or her post. *Id*.

Alvares does not dispute that the business program closed due to lack of student interest and lack of success. *Id*. ¶ 18. Even so, Alvares testified that she believed her medical leave was the only reason she was terminated. *Id*. ¶¶ 20–21; [84-3] at 23:21–24:12. Alvares later testified that she believed that the business program's closure and her layoff were based on her race and age, but she could recall no evidence to support those beliefs.[5] [86] ¶ 21; [84-3] at 68:6–69:12.

## B. Alvares's Employment Record

### 1. *Teaching Evaluations*

To evaluate teacher performance, the Board and the union developed a process that included two informal observations, two formal observations, and conferences with the teacher. [86] ¶ 22. After calculating a total score from the classroom observations, each teacher received a rating on a four-tier scale: (1) excellent, (2) proficient, (3) developing, or (4) unsatisfactory. *Id*. ¶¶ 22–23.

Alvares's ratings ranged from "developing" to "unsatisfactory." During the 2013–2014 school year, McGill and two other administrators conducted Alvares's observations; she earned a "developing" rating—the second lowest tier. *Id*. ¶ 24. The next school year, McGill conducted all four of Alvares's observations; although her total score improved, it still fell within the "developing" range. *Id*. ¶ 25. During the

---

[5] Alvares says this fact is in dispute because she testified that she believed the school closed the business program due to her age. *See* [86] ¶ 21. But that does not controvert the fact that, when asked if she had any evidence to support that belief, she said "no." [84-3] at 68:17–19.

2015–2016 school year, with McGill again conducting Alvares's evaluations, her total score decreased but still fell within the "developing" range. *Id.* ¶¶ 27, 29. Under the collective bargaining agreement in effect at the time, however, a teacher who received two consecutive "developing" ratings would be deemed "unsatisfactory" if, in the second year, her overall score did not improve. *Id.* ¶ 27. Because Alvares's total score decreased from the previous year, her 2015–2016 rating defaulted to "unsatisfactory." *Id.* ¶¶ 26–27.[6]

During the 2015–2016 school year, Alvares's final observation occurred later than usual because she was on medical leave from late April until June 8. *Id.* ¶ 28. Although the school normally did not conduct observations so close to the end of the school year, one of the Board's attorneys advised McGill to schedule the observation at the earliest possible opportunity. *Id.* McGill followed the advice, conducting the final observation on June 9, Alvares's first day back from leave. *Id.*

As the instructional leader at Westinghouse, McGill evaluated teachers who, like Alvares, were on professional development plans or performance improvement plans. *Id.* ¶ 30. Based on his classroom observations of Alvares, McGill provided 105 pages of evidence to justify Alvares's 2015–2016 rating. *Id.* ¶ 29. McGill testified that he did not have bias or personal animus against Alvares. *Id.* ¶ 30; [84-21] at 74:24– 75:3, 75:22–76:8. That same school year, however, Alvares received a teacher scholarship from Illinois Jump$tart Coalition—an entity independent from the

---

[6] Alvares did not receive a rating for the 2016–2017 school year, because she was on leave from November 2016 until she was laid off the following August. [86] ¶ 31.

Board—in recognition of her commitment to teaching finance and economics. [91] ¶ 1; [85-10] at 1.

### 2. *Disciplinary Measures*

The school disciplined Alvares for poor performance and issued her three disciplinary citations—called "performance improvement processes"—in December 2015. [86] ¶ 32; [84-24] at 9–11. PIPs came in three levels: Step 1 (least severe), Step 2, and final warning (most severe). [86] ¶ 32. McGill issued Alvares one of each. *Id.* ¶ 33. Before issuing the PIPs, McGill consulted with, and received approval from, a CPS labor-relations official to ensure appropriate timing, content, and classification. *Id.* Alvares received PIPs for tardiness and submitting untimely and outdated lesson plans, failing to adhere to exam-administration policies, and committing the school to unapproved expenses. *Id.* ¶¶ 34–57.

Alvares received a Step 1 PIP in December 2015 for submitting untimely and outdated curriculum planning documents and for tardiness. *Id.* ¶¶ 39, 43; [84-24] at 9. Westinghouse required teachers to submit curriculum planning documents—including syllabi, course maps, and assessments—to department heads by a certain date before each school year. [86] ¶¶ 34–35. Alvares missed the submission date in September 2015, and although she eventually submitted curriculum documents, they were outdated and contained inaccurate dates. *Id.* ¶¶ 35–36. Alvares admitted that she untimely submitted a previously created unit plan, but she blamed the inaccurate dates on clerical and data-entry errors. *Id.* ¶ 37. The Step 1 PIP also encompassed her record of tardiness. *Id.* ¶ 43. Alvares acknowledged that she was tardy on two

separate occasions, once in September 2015 and once in November 2015, but blamed the November tardiness on a massive snowstorm that hit Chicago that day. *Id.* ¶¶ 40–43; [91] ¶ 5.

McGill also issued Alvares a Step 2 PIP for failing to competently administer a QuickBooks certification exam. [86] ¶ 44; [84-24] at 10. The CPS Law Department independently investigated Alvares based on perceived irregularities in the exam results. [86] ¶ 45. Before 2015, no one at Westinghouse had passed the exam; that year, however, every student in Alvares's class passed the exam with high scores. *Id.* The investigator concluded that there was credible evidence that Alvares allowed her students to take the exam multiple times (four times on average), which allowed them to familiarize themselves with the questions and answers, defeating the purpose of the test. *Id.* ¶¶ 46–47. Alvares admitted that most of her students took the exam multiple times—some as many as six to eight times—and that she allowed students who had not yet taken the exam to remain in the room as other students took the exam. *Id.* ¶¶ 47–49. The Law Department investigation also found, on the other hand, that there was no credible evidence to suggest that Alvares provided her students with the exam's questions or answers. [91] ¶ 2. McGill gave Alvares a Step 2 PIP for failing to adhere to exam administration policies; based on his own findings, McGill concluded that Alvares had failed to maintain a log showing when students signed in and out, and she permitted electronic devices and students' property to remain in the

exam room—serious violations of exam procedure that put the validity of student scores in jeopardy. [86] ¶¶ 50–51.[7]

Lastly, Alvares received her third PIP (initially a final-warning PIP but later reduced to Step 2 after arbitration) for violating Board policy by committing the school to expenditures without authorization. *Id*. ¶ 57. Alvares took a group of students to an out-of-town conference. *Id*. ¶ 52. Although Alvares was aware of the need to submit school-expenditure requests in advance, she failed to seek advance authorization to have Westinghouse pay for conference registration fees and student hotel expenses. *Id*. ¶¶ 52–53, 56. Instead, Alvares's application for student travel represented that the business CTE program, and not Westinghouse's school budget, would cover the costs for students. *Id*. ¶ 54.[8] When Alvares and the students arrived at the hotel, however, she did not have funds for the registration fees or the hotel. *Id*. ¶ 55. With the students at risk of being ousted from the hotel and stranded without transportation, Alvares called the school for help. *Id*. McGill and Conneka Travis, the former business manager at Westinghouse, rushed to get checks to cover the costs,

---

[7] These facts are undisputed, but Alvares maintains that she followed exam administration procedures. *See* [91] ¶ 3. Specifically, Alvares states that "[t]here is no mention in these procedures where test takers may stow their book bags and other personal belongings" or "restricting how many times a student may take the test." *Id*. The policy Alvares cites, however, bans electronic devices from the testing area and states that student property "such as books or bags, should be stored outside the testing environment." [85-3] at 2. Alvares is correct that the policy does not expressly limit the number of retakes, although it does warn that "retakes may reveal patterns of cheating." *Id*. at 1. In any event, the Step 2 PIP made no mention of student retakes; rather, it focused on Alvares's (1) failure to maintain a log and (2) failure to exclude student electronic devices and personal property from the testing area. *See* [86] ¶ 51; [84-24] at 10.

[8] Alvares says that McGill "signed off" on "the" check request in October 2014. [91] ¶ 4. But the 2014 request was for $360 to cover student-membership fees to a business organization, not the November 2015 conference registration fees and overnight costs. [85-5] at 15.

16

which totaled over $2,000. *Id.* ¶¶ 53, 55. Travis heard McGill say that he intended to get Alvares "out of here" as he marshaled the information about Alvares's botched field trip. [91] ¶ 19; [85-21] ¶ 19.

### 3. *Delayed Payment for Sick Days*

In late September 2016, Alvares allegedly fell and sustained injuries in her classroom. [86] ¶ 58. Alvares took three days off (two sick days and one personal day) in early October and, per Board policy, submitted an absence form to McGill for approval. *Id.* ¶¶ 59–60. Under Board policy, if a supervisor had reasonable suspicion that an employee was abusing sick days, he could demand that the employee provide certification from a physician. *Id.* ¶ 61. McGill suspected that Alvares was abusing her sick days, in part, because she had a history of suspiciously timed absences that disrupted her teaching evaluations. *Id.* ¶ 62.[9] McGill approved the absence for the personal day but asked Alvares for a doctor's note for the sick days. *Id.* ¶¶ 62–63. Alvares explained that she was recovering from the fall in her classroom and had since undergone treatment, but she did not have a doctor's note for the two sick days. *Id.* ¶ 64. Alvares filed a grievance in December 2016 to receive payment for the sick days, and McGill ultimately approved payment for the sick days. [91] ¶ 14; [86] ¶ 65.

### 4. *Grievances against McGill*

From April 2016 to September 2017, Alvares's union filed three grievances against McGill on her behalf. In April 2016, after Alvares's successful arbitration

---

[9] I disregard the Board's reliance on what teachers, staff, and students told McGill regarding Alvares's use of her sick days because such statements are inadmissible hearsay. [86] ¶ 62.

reducing her expense-related PIP from final warning to Step 2, the union filed a grievance against McGill accusing him of personal animus and retaliation based on Alvares's engagement in protected union activity (the arbitration). [91] ¶ 10; [85-12] at 1. The grievance asked McGill to "[c]ease and desist with your unfair and unequal scrutiny" toward Alvares, to assign an outside administrator to perform Alvares's teacher evaluations, and to have the school perform additional observations during the 2015-2016 school year "to void the tainted one driven by your personal animus." [91] ¶ 10; [85-12] at 1. In December 2016, the union filed another grievance, this time seeking payment for Alvares's two October sick days. [91] ¶ 14. The grievance claimed that McGill was still retaliating against Alvares for her arbitration victory and for her use of a contractually negotiated benefit. [85-16] at 1. Finally, the union filed a third grievance against McGill in September 2017, roughly a month after Alvares was laid off. [91] ¶ 13. The third grievance accused McGill of ignoring the union's efforts to obtain information regarding Westinghouse's reasons for closing the business program. [85-15] at 1–2.[10]

5.    *McGill's Treatment of Alvares*

Travis (the former business manager) stated in her affidavit that McGill heavily scrutinized Alvares, treated her differently from white people—specifically, by punishing her for tardiness on snow days and launching an investigation against her—and often referred to her as "stupid or dumb." [85-21] ¶¶ 7–8, 17–20. Alvares,

---

[10] The grievance itself—the only document cited for this fact—does not support Alvares's assertion that "McGill did not respond to this Grievance no[r] supply any particulars to Plaintiff." [91] at ¶ 13.

however, acknowledged that McGill never called her any derogatory names, nor said anything racist or ageist to her. [86] ¶ 69; [84-3] at 47:5–17, 76:10–13. While Alvares testified that she believed she was rated "developing" due to her race, she could not recall facts to support that belief; she also testified that she did not have any evidence to support her belief that she was laid off due to race or age. [86] ¶¶ 71–73; [84-3] at 33:24–34:12, 68:17–19, 69:6–12, 76:14–17.

### D. Administrative Proceedings

In November 2016, Alvares filed a discrimination charge with the Equal Employment Opportunity Commission. [86] ¶ 66. Alvares claimed that she had been discriminated against based on her age and race on October 14, 2016. [84-2] at 10. "During my employment, I have been harassed and disciplined," Alvares said, "I have been subjected to different terms and conditions of employment, than younger and white co-workers, including … docked wages and scrutiny." *Id*. In November 2017, Alvares amended the charge, adding allegations of retaliation and claiming that the school engaged in unjustified observations of her teaching, assigned her courses outside of her curriculum, denied her permission to attend a professional development course, delayed provision of resources for her students, and placed her on a 90-day remediation plan. *Id*. at 11; [86] ¶ 67. The amended charge claimed that the discrimination last took place on August 24, 2017, and Alvares noted that "[s]ince filing the instant charge, [Westinghouse] has discharged me." [84-2] at 11. The EEOC issued a right-to-sue letter, and Alvares filed this suit. *See* [84-2] at 13.[11]

---

[11] Alvares opted not to pursue the retaliation claim.

## IV.    Analysis

### A.    Age Discrimination

Alvares has abandoned her age discrimination claim. The ADEA protects workers aged 40 and older from age-based employment discrimination. 29 U.S.C. §§ 621(b), 631(a). While Alvares falls within that protected class, she has produced no evidence to support her age discrimination claim, testified that she has no evidence to support age discrimination, and offers no argument about her ADEA claim in her brief. Because Alvares has failed to demonstrate that her assertions of age discrimination have any factual or legal support, the Board is entitled to summary judgment on the ADEA claim. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020).

### B.    Race Discrimination

Title VII prohibits an employer from discriminating against an employee based on her race. 42 U.S.C. § 2000e-2(a).[12] The question here is whether a reasonable factfinder could find that Alvares was subjected to an adverse employment action based on her race. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020); *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019). A plaintiff may prove discrimination either directly or indirectly. *McKinney v. Off. of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). Alvares relies on the indirect

---

[12] In her brief, Alvares avers that "we now know that McGill … has prejudice against people of color, and particularly women." [85] at 10. She cites no fact or evidence to support this assertion, and this is not a sex discrimination case. Alvares did not claim—in her EEOC charge or her complaint—that McGill discriminated against her on the basis of her sex.

burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and on the holistic approach supplied by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Under the indirect burden-shifting method, Alvares must establish a prima facie case of discrimination. *Barnes*, 946 F.3d at 389; *Riley v. Elkhart Community Schools*, 829 F.3d 886, 891–92 (7th Cir. 2016). To establish a prima facie case of race discrimination, Alvares must "present evidence that (1) she is a member of a protected class, (2) she was meeting the Board's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). If Alvares makes this showing, then the burden shifts to the Board to produce a legitimate, nondiscriminatory reason for its action. *Barnes*, 946 F.3d at 389. The burden then shifts back to Alvares to produce evidence that the Board's stated reason was pretextual. *Barnes*, 946 F.3d at 389; *Riley*, 829 F.3d at 892.

An adverse employment action under Title VII is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir.2000)). Here, there's no dispute that Alvares is a member of a protected class and that her termination constitutes a

materially adverse employment action. The parties quibble, however, over whether Alvares may base her claim on certain other acts.

"[T]o bring a Title VII claim at all … a plaintiff must file a complaint with the EEOC within 300 days of experiencing the complained-of discrimination." *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 825 (7th Cir. 2015). Because Alvares filed her EEOC charge November 2, 2016, the Board argues that claims based on discriminatory acts before January 7, 2016, are time-barred; therefore, it says, the only acts Alvares identifies within the limitations period are her temporarily unpaid sick days (which is not an adverse employment action) and her termination. Alvares counters that because she has identified one materially adverse action within the limitations period (her layoff), she should also be allowed to ground her discrimination claims on acts outside the limitations period under the continuing violation doctrine. Alvares further argues that other instances of discriminatory conduct—the unpaid sick days, McGill's solo evaluations of Alvares, the 2016 evaluation after the normal observation period, and not having her own office or her name on the teacher roster—add up to a materially adverse employment action. *See* [85] at 12.

Alvares's arguments fall flat because the continuing violation doctrine applies to hostile work environment claims, not to claims based on discrete discriminatory acts. *See Swanson*, 794 F.3d at 826 ("A plaintiff who complains of discrete discriminatory acts … must report each act to the EEOC in the required timeframe. … By contrast, a plaintiff who makes a hostile work environment claim may invoke

the continuing violations doctrine and recover for related employer conduct outside the limitations period." (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 117 (2002))). Alvares does not make a hostile work environment claim here,[13] so her allegations of discrimination before January 7, 2016, are time-barred. And because the two temporarily unpaid sick days do not amount to a materially adverse employment action, the scope of Alvares's Title VII claim is limited to whether her layoff was racially discriminatory. *See Swanson*, 794 F.3d at 826.[14]

Alvares's discrimination claim fails under *McDonnell Douglas* because she has not marshaled evidence to demonstrate that she was meeting the Board's legitimate expectations, that she was treated less favorably than similarly situated employees outside of her protected class, or that the Board's proffered reasons for closing the business program were pretextual.

First, Alvares lacks evidence showing that she met the Board's legitimate expectations. She argues that her performance would have been satisfactory if not for

[13] "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)). To survive summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence demonstrating "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). Alvares has not produced sufficient evidence to permit a reasonable jury to find in her favor on a hostile work environment claim. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015–16 (7th Cir. 2018) (short-tempered, hostile, unfairly critical, and disrespectful supervisors who excessively monitored plaintiff did not create objectively offensive, severe, or pervasive conditions or a hostile workplace "permeated with discriminatory intimidation, ridicule, and insult").

[14] Alvares also cannot base her claim on her final teaching evaluation from June 2016, because even if timely, negative performance reviews and performance improvement plans do not constitute adverse employment actions. *Fields*, 928 F.3d at 626.

McGill's biased evaluations. [85] at 10–11. Alvares posits that McGill had animus against her, so she did not "get a fair shake." *Id.* at 11. And, she says, Travis's and Anderson's affidavits show that McGill had bias against Alvares because she is Asian. *Id.* at 13. Alvares also claims that she received teaching awards from outside organizations, and that her ratings fell only after McGill became the principal at Westinghouse. *Id.* at 10–11.

Beyond conjecture and generalizations regarding McGill's bias, however, Alvares does not point to any evidence in the record that undermines the accuracy of her negative teacher ratings or her PIP citations. Indeed, Alvares admits that she earned below average and unsatisfactory teacher ratings and received three disciplinary write-ups for tardiness, missed deadlines, and failing to follow exam-administration procedures. *See* [86] ¶¶ 24–30, 32–57; [85] at 11 (noting that Alvares "was cleared of serious cheating charges" but "did violate some procedural aspects" of the exam procedures). Alvares must do more than say that her evaluations were tainted with bias; she must produce evidence showing that she was, in fact, meeting the Board's legitimate expectations.

The evidence does not give rise to a reasonable inference that Alvares was meeting the Board's expectations. That she received awards from independent organizations does not demonstrate that she was meeting the Board's expectations. *See Smith*, 936 F.3d at 560 ("[A] smattering of decent reviews doesn't overcome the overwhelming number of documented problems."). And while Travis and Anderson stated that Alvares was a good teacher, that is insufficient to create a genuine dispute

of fact about her performance, and their affidavits contain no allegations regarding Alvares's performance reviews. *See Peele*, 288 F.3d at 329 ("[G]eneral statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated.").

Second, Alvares has not identified a similarly situated employee who received better treatment. Similarly situated employees need not be identically positioned, but they must be "'directly comparable' to the plaintiff 'in all material respects.'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). Alvares relies entirely on Travis's affidavit to support this aspect of her case. Specifically, she points to Travis's assertions that McGill launched investigations into Alvares and an African American payroll clerk but never against a white employee, and that other teachers were not disciplined for tardiness. [85] at 12. But general statements that Alvares was investigated or disciplined, while other employees were not, do not suffice. Alvares must instead identify a similarly situated employee outside her protected class who was treated better than she was—a teacher who was not fired even though they had poor performance evaluations and worked in a program that was closing down. She cannot establish a prima facie case under *McDonnell Douglas* when, as here, she provides "no evidence concerning a similarly situated employee from which the district court could draw a comparison." *Igasaki*, 988 F.3d at 958.

Third, even if Alvares had met her prima facie burden, the Board would still be entitled to summary judgment. The Board has offered a legitimate, nondiscriminatory reason for Alvares's termination—closure of the business program due to lack of student interest and desire to create an engineering program—and Alvares has not produced evidence of pretext. To make a showing of pretext, Alvares must present evidence suggesting that the Board's proffered reason is a lie. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021). To meet this burden, Alvares "'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's asserted 'reasons that a reasonable person could find it unworthy of credence.'" *Id.* (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). Alvares focuses on McGill's credibility and says that "it is doubtful that McGill can be trusted." [85] at 14–15.

But Alvares has not produced any evidence that undercuts the Board's stated reasons for closing the business program. On the contrary, Alvares admits that the business program was "floundering" and student interest in the program declined as interest in engineering courses rose. [86] ¶¶ 11–17. Alvares introduces a statement by CPS's Chief Education Officer announcing a district-wide policy emphasizing the importance of financial literacy. [91] ¶ 12. But that statement does not conflict with the closure of Westinghouse's business program and does not support an inference that the Board's explanation for closing a specific program at Westinghouse was a lie. On this record, no reasonable factfinder could conclude that the Board's stated reasons for closing the business program were pretextual.

Alvares's Title VII claim fares no better under *Ortiz*'s holistic approach. Under *Ortiz*, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. But, whether under *McDonnell Douglas*'s burden-shifting framework or the *Ortiz* approach, what matters at summary judgment is whether Alvares "presented enough evidence to allow the jury to find in [her] favor." *Igasaki*, 988 F.3d at 957–58 (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)). The evidence as a whole suggests that Alvares was laid off because the Board made the non-discriminatory decision to eliminate the business program and there was no available opening for her elsewhere. Alvares acknowledged that McGill never called her any derogatory names. *Id.* ¶ 69; [84-3] at 47:5–17, 76:10–13. Alvares received below average ratings, was disciplined several times in recent years, and the business program struggled to maintain student support. None of Alvares's evidence suggests that she was laid off based on her race.

Viewing all of the evidence in the light most favorable to Alvares, a juror might infer that McGill didn't like Alvares and treated her harshly. But that is not enough to suggest racial motivation for the termination. Travis supplies some admissible evidence of racial bias on McGill's part, but the connection to Alvares's layoff is nonexistent. Alvares concedes that her program closed for nondiscriminatory reasons and McGill and the Board complied with union-negotiated requirements to terminate her position. There is no room in the chain of causation for race-based decisionmaking to supply an explanation for Alvares's layoff. In short, whether viewed through the

*McDonnell Douglas* or *Ortiz* lens, Alvares has not offered evidence to permit a jury to conclude that the Board discriminated against her on the basis of her race.

## V.  Conclusion

The motion for summary judgment, [82], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  May 10, 2021